UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VISTORS PUBLISHING, individually and on behalf of a class and subclass of all those similarly situated, | ) Case No. ) ) ) ) **CLASS ACTION COMPLAINT** |
| Plaintiff, | ) ) |
| v. | ) ) |
| FRONTIER COMMUNICATIONS CORPORATION, a Delaware corporation, and ENHANCED SERVICES BILLING, INC., a Delaware corporation; | ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Vistors Publishing brings this class action complaint against Defendants Frontier Communications Corporation ("Frontier") and Enhanced Services Billing, Inc. ("ESBI"), based upon Defendants' practice of charging telephone subscribers for unauthorized products and services.

## PARTIES

1.  Plaintiff Vistors Publishing is headquartered in Pine Bush, New York.

2.  Defendant ESBI is a billing processor, or "aggregator," for numerous telephonic services provided by numerous third-parties and billed to the consuming public through local landline telephone providers, also known as local exchange carriers ("LECs"). ESBI is a Delaware corporation with its headquarters in San Antonio, Texas. It does business throughout the State of New York.

3.  Defendant Frontier Communications Corporation (NYSE: FTR)("Frontier") is publicly traded local exchange carrier company, which is incorporated in Delaware and headquartered in Stamford, Connecticut. Frontier does business as an LEC and provides the consuming public with local and long-distance telephone service, Internet access, wireless

Internet access, digital phone and DISH satellite TV services.  Frontier operates in 24 states, including New York, and provides services to the consuming public via approximately 3.0 million access lines.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this civil action pursuant to the Class Action Fairness Act, and particularly, 28 U.S.C. § 1332(d)(2), as the matter in controversy in this action exceeds $5,000,000.00 and is a class action in which members of the class of plaintiffs are citizens of a state that is different from the principal place of business of Defendants.

5.      Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b) and (c), because Plaintiff maintains its headquarters, transacts business, maintains offices, or is otherwise found within this District; and the Defendants' unlawful acts giving rise to Plaintiff's claims occurred, and a substantial portion of the affected trade and commerce described below has been carried out in this District.

## STATEMENT OF FACTS

6.      The technology of most telephones has advanced so that the devices can be used to purchase products and services in addition to their traditional function of making and receiving telephone calls.

7.      In the telecommunications industry, "premium content" refers to additional products and services offered for sale to telephone service subscribers by third-party providers. The delivery of premium content involves the relationship between the providers of premium content, aggregators, and LECs.  Premium content providers charge and collect monies from

customers by "piggybacking" on the telephone bills sent to customers by the LECs, such as Defendant Frontier.

8.      Third-party premium content providers often lack direct access to the local exchange carriers who have the ability to issue bills to the telephone service subscribers.   As a result, premium content providers commonly partner with middlemen known as "aggregators," such as Defendant ESBI.   Aggregators act as conduits between the numerous premium content providers and the large local exchange telephone carriers, such as Defendant Frontier. Aggregators, such as Defendant ESBI, represent multiple premium content providers in negotiating and formalizing the agreements that allow the premium content providers to use and gain access to the billing and collection mechanisms of the LECS.   As a result of these partnerships, the premium content providers have the ability to: (i) use a carrier's network to deliver their services to that carrier's subscribers; and/or (ii) use a carrier's billing system to collect payment for their premium content services from that carrier's subscribers.   In return, the aggregators and the carriers each keep a percentage of the premium content charges.

9.      In short, aggregators operate the transaction networks to help companies develop, deliver and bill for premium content services throughout the State of New York and the nation. This allows content providers to focus on developing and marketing content applications and programs while aggregators manage the complex carrier relationships, distribution, billing and customer service.

10.     In some instances, aggregators charge premium content providers up-front fees. More commonly, however, the aggregators' revenue is generated through a "revenue share" on transactions for which they bill telephone subscribers.   Thus, each time a charge is incurred in

connection with the purchase of premium content services offered by a third-party content provider, the aggregator and/or the content provider cause that charge to be billed directly on the customer's telephone bill from the LEC. The LEC then bills and collects the charge from its customers, retains a portion of the proceeds as its "revenue share" and then remits the balance to the aggregator who has direct access to its networks. The remainder is remitted to the third-party premium content provider.

11.     A premium content provider simply needs the consumer's telephone number in order to charge that consumer for its products and services. This information (the consumer's name and telephone number), however, is readily available through the public domain. This is markedly different from transactions made using checks and credit cards, each which require either a signature or a highly private sixteen digit credit card number.

12.     Once a premium content provider has a consumer's telephone number, it can cause that consumer to be billed for services and products. A premium content provider accomplishes such billing by providing the telephone number, along with an amount to be charged to the account associated with that telephone number, to an aggregator.

13.     In turn, the aggregator instructs the relevant LEC to add the charge to the bill associated with the account for that telephone number. The charge will then appear on the consumer's landline telephone bill, often accompanied by minimal, cryptic identifying information.

14.     A serious flaw with this business structure and the collection methods of carriers, aggregators and third-party mobile content providers has developed. The billing and collection systems established in aid of the premium content providers by companies including Defendants

4

ESBI and Frontier are free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' telephone bills. Recycled numbers, misleading "consent" procedures, the absence of a signature requirement or other confirmations such as personal code numbers, exacerbate the likelihood of unauthorized and unlawful charges. As a result, aggregators, third-party premium content providers, and LECs bill and collect monies for services in many instances where the customer never gave authority to receive and be billed for the content.

15.     The premium content industry has resulted in the "cramming" of telephone bills with charges for unauthorized purchases of products and services, as well as charges for products and services which lack commercial viability. Indeed, a government investigation of one landline premium content industry participant, Nextweb Media, LLC d/b/a Email Discounts, LLC, found that over ninety (90) percent of its charges to landline telephone accounts were unauthorized by the billed party.

16.     The practice of collecting for unlawful charges has been understood, perpetuated and even encouraged by aggregators and LECs. Defendants' methods for determining whether the telephone subscriber has provided authorization for premium content are highly problematic. Defendants, moreover, know or reasonably should know that significant amounts of money has been collected on account of such unauthorized charges for premium content in the industry over the past several years. While Defendants have the capability to prevent the collection of money for unauthorized charges, Defendants have chosen to knowingly maintain the system that has allowed the continued collection of unauthorized charges. Defendants have benefitted financially by retaining a percentage of the improper collections.

5

17.     When consumers complain about unauthorized premium content charges, many premium content providers and aggregators such as Defendant ESBI attempt to create the appearance that a charge was authorized by producing a "customer's" personal demographic information, such as a street address or mother's maiden name.   Much of this information, however, is acquired in bulk from vendors who assemble it from publicly available sources and does not represent actual customer acquiescence.   These companies then use this information to process charges to consumers' telephone bills.   In addition, content providers and ESBI use recordings of surveys and other unrelated communications with consumers as evidence of their "authorization" for charges if the consumer questions ESBI's charges.   If consumers protest, content providers and aggregators will at times relent and process a refund, employing a "charge first, refund later, if at all" approach to their business.   In spite of the knowledge that large numbers of telephone subscribers are billed for services they neither wanted nor authorized, Defendants continue to engage in and promote deceptive and unauthorized premium content charges.

18.     The widespread practice of charging unauthorized and otherwise deceptive premium content charges to the telephone subscribers' bills is exacerbated by the fact that the charges for premium content services are often not clearly identified on subscribers' bills.   This obfuscation makes it impossible for subscribers to identify the origin or nature of the charge, or to distinguish it from the numerous legitimate line-item charges and fees that appear on the average consumer's telephone bill.   In addition, because charges for premium content services are sometimes no more than a few dollars, subscribers who use automatic bill-paying services may never even notice such charges.

6

19.     Despite Defendants' knowledge of the fact that they are collecting monies for unauthorized premium content charges to consumers' telephone bills, and despite Defendants' ability to stop these unauthorized billing practices, Defendants have purposefully maintained this system rife with abuse because it is a significant revenue stream.

20.     Defendants' continued conduct in billing telephone subscribers for premium content, combined with their failure to implement a billing system that ensures only those consumers who did, in fact, authorize charges for such services are billed for them, is a deliberate strategy by Defendants to unlawfully collect from numerous consumers on a monthly basis unauthorized premium content charges.

## THE FACTS RELATING TO NAMED PLAINTIFF

21.     Plaintiff Vistors Publishing obtained landline telephone services from Defendant Frontier.

22.     Beginning in or about 2009, Plaintiff Vistors Publishing's telephone account was charged monthly by Defendants Frontier and ESBI for premium content services which appeared on Plaintiff's monthly telephone bill from Frontier as "Enhance SVCS Billing Inc Long Distance Calls . . . IBA-Services" in the amount of $39.95.

23.     At no time did Plaintiff Vistors Publishing knowingly authorize these charges for premium content services.

24.     Plaintiff Vistors Publishing paid at least some of the unauthorized charges because it was unaware and/or confused as to the nature of the charges.

7

25.     When Plaintiff Vistors Publishing complained to Defendant ESBI concerning these unauthorized charges for premium content services, Defendant ESBI refused to provide a refund or remove the charges. Instead, Defendant ESBI told Plaintiff Vistors Publishing that it had authorized these charges, which is false.

26.     Defendants have yet to provide a full refund to Plaintiff Vistors Publishing of the unauthorized charges. Defendants also have failed to implement adequate procedures to ensure that such unauthorized charges do not appear in future billing periods and/or an assurance that such unauthorized charges will not appear in future billing periods.

## CLASS ALLEGATIONS

27.     Plaintiff Vistors Publishing brings this action on behalf of herself and a class and a subclass of similarly situated individuals (the "Classes"), defined as follows:

(a)     A class ("Class") of all telephone subscribers in the state of New York who suffered losses or damages as a result of ESBI billing for premium content products and services not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants, and (ii) any employee of Defendants.

(b)     A subclass ("Subclass") of all Frontier landline telephone subscribers in the state of New York who suffered losses or damages as a result of ESBI billing for premium content products and services not authorized by the subscriber; provided, however, that the following are excluded from this Subclass: (i) the Defendants, and (ii) any employee of Defendants.

28.     The Class and Subclass consist of thousands of individuals and other entities, making joinder impractical.

29.    Plaintiff Vistors Publishing's claims are typical of the claims of all of the other members of the Class and Subclass.

30.    Plaintiff Vistors Publishing will fairly and adequately represent and protect the interests of the other members of the Class and Subclass.  Plaintiff Vistors Publishing has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass.  Neither Plaintiff nor its counsel has any interest adverse to those of the other members of the Class and Subclass.

31.    Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive, and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

32.    Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Class and Subclass, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and Subclass.

33.    The factual and legal bases of Defendants' liability to Plaintiff and the other members of the Class and Subclass are the same.  Plaintiff and the other members of the Class and Subclass have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

34.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class and Subclass, and those questions predominate over any questions that may affect individual members of the Class and Subclass.

35.     Common questions for the Class and Subclass include, but are not limited to, the following:

(a)     Whether ESBI has unjustly received money belonging to Plaintiff and the other members of the Class and Subclass, and whether under principles of equity and good conscience, ESBI should not be permitted to retain it;

(b)     Whether ESBI has tortiously interfered with contracts between Plaintiff and the Class and Subclass, on the one hand, and their telephone carriers, including but not limited to Frontier, on the other hand, by causing them to be charged for products and services by their carriers that were unauthorized; and

(c)     Whether ESBI's conduct described herein constitutes deceptive acts and practices in violation of New York General Business Law Section 349.

36.     Common questions for the Subclass include but are not limited to the following:

(a)     Whether Frontier's conduct constituted a breach of contract; and

(b)     Whether Frontier's conduct described herein constitutes deceptive acts and practices in violation of New York General Business Law Section 349.

**FIRST CAUSE OF ACTION**
**(Violation of New York General Business Law Section 349)**

37.     The allegations contained above are realleged and incorporated by reference as if fully set forth herein.

38.     New York General Business Law Section 349 ("GBL § 349") specifically prohibits deceptive acts or practices in the conduct of any business, trade or commerce.

39.     Defendants ESBI and Frontier provide products and/or services to the consuming public in New York, including telephone landline services and premium content.  Defendants bill Plaintiff and the other members of the consuming public in New York and falsely represent therein that Plaintiff and the other class members have approved, authorized, and/or consented to charges for premium content services, when they have not, and as a result, Defendants' bills are deceptive and unfair.

40.     As a result of Defendants' deceptive and unfair business practices directed towards the consumer public in New York and elsewhere, Plaintiff and the other members of the Class and Subclass have suffered damages.

41.     Defendants' violations of GBL § 349 were purposeful, entitling Plaintiff and the other members of the Class and Subclass to monetary relief and payment of the Plaintiff's counsel's attorney's fees.  In addition, Plaintiff is entitled to declaratory and injunctive relief to ensure that Defendants do not continue to violate New York law.

## SECOND CAUSE OF ACTION
### (Breach of Contract and Covenant of Good Faith and Fair Dealing on behalf of the Subclass as to Frontier)

42.     Plaintiff incorporates by reference the foregoing allegations.

43.     Plaintiff and the Subclass entered into substantially identical Service Agreements with Defendant Frontier whereby Plaintiff and the Subclass agreed to pay an agreed upon sum in

return for Defendant Frontier's activation of Plaintiff's telephone account and Defendant's provision of communication services to Plaintiff and the Subclass.

44.     Defendant Frontier expressly and/or impliedly agreed to provide Plaintiff and the other members of the Subclass with a landline telephone number free of unauthorized charges for third-party products and services.

45.     Defendant Frontier expressly and/or impliedly agreed to bill Plaintiff and the Subclass only for products or services the purchase of which they had authorized.

46.     Defendant Frontier further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

47.     Defendant Frontier breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiff and the Subclass for services, the purchase of which was never authorized.

48.     The aforementioned breach of contract has proximately caused the Plaintiff and the Subclass economic injury and other damages.

## THIRD CAUSE OF ACTION
**(Tortuous Interference with a Contract on behalf of
both Class and Subclass as to ESBI)**

49.     Plaintiff incorporates by reference the foregoing allegations

50.     Plaintiff and the respective Class and Subclass had contractual relationships with their telephone carriers, including, but not limited to, Defendant Frontier, whereby they agreed to pay a certain sum of money in exchange for activation of their telephone accounts and their carriers' promises to provide various communications and related services to Plaintiff and the

other members of the Class and Subclass, and to bill Plaintiff and the members of the Class and Subclass for only products or services the purchase of which they had authorized, in accordance with New York law.

51.     Defendant ESBI knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

52.     Defendant ESBI intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing unauthorized charges to be placed on the telephone bills of telephone owners across the state of New York in violation of New York law.

53.     Plaintiff and the other members of the Class and Subclass suffered loss as a direct result of Defendant ESBI's conduct.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Vistors Publishing, on behalf of itself and the Class and Subclass, prays for the following relief:

(a)     Certify this case as a class action on behalf of the Class and Subclass defined above, appoint Vistors Publishing as Class Representative, and appoint Giskan Solotaroff Anderson & Stewart LLP, as lead counsel;

(b)     Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct,;

(c)     Award Plaintiff and the Class and Subclass reasonable costs and attorneys' fees;

(d)     Award Plaintiff and the Class and Subclass pre- and post-judgment interest;

(e)     Enter judgment for injunctive and/or declaratory relief as is necessary to

protect the interests of Plaintiff and the Class and Subclass; and

(f)     Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.


Dated:  August 26, 2010

Respectfully submitted,

Giskan Solotaroff Anderson & Stewart LLP

Oren Giskan (OG 3667)
Catherine E. Anderson (CA 5129)
Giskan Solotaroff Anderson & Stewart LLP
11 Broadway, Suite 2150
New York, NY 10004
Tel: (212) 847-8315
ogiskan@gslawny.com
canderson@gslawny.com


Bruce E. Menken
Beranbaum Menken LLP
80 Pine Street, 33rd Floor
New York, NY 10005
Tel: (212)509-1616

*Counsel for Plaintiff, the Class and Subclass*